1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11   SHASTA RESOURCES COUNCIL, a
     California public benefit
12   corporation; SHASTA COALITION FOR
     PRESERVATION OF PUBLIC LAND, a
13   California unincorporated
     association; SACRAMENTO RIVER
14   PRESERVATION TRUST, a California
     public benefit corporation,
15                                          NO. CIV. 08-645 WBS CMK

16           Plaintiffs,

17       v.                                 MEMORANDUM AND ORDER RE:
                                            MOTION AND CROSS-MOTIONS
18   UNITED STATES DEPARTMENT OF THE        FOR SUMMARY JUDGMENT
     INTERIOR; KENNETH LEE SALAZAR, in
19   his official capacity as
     Secretary of the Department of
20   the Interior; INTERIOR BOARD OF
     LAND APPEALS; BUREAU OF LAND
21   MANAGEMENT; JIM CASWELL, in his
     official capacity as Director of
22   the Bureau of Land Management;
     MIKE POOL, in his official
23   capacity as State Director of the
     Bureau of Land Management; STEVEN
24   W. ANDERSON, in his official
     capacity as Field Manager of the
25   Redding Field Office of the
     Bureau of Land Management; BRENT
26   OWEN; and KIMBERLY D. HAWKINS,

27           Defendants.
     _____/
28                         ----oo0oo----

                               1

Plaintiffs Shasta Resources Council, Shasta Coalition for Preservation of Public Land, and Sacramento River Preservation Trust brought this action against defendants United States Department of the Interior, Interior Secretary Kenneth Lee Salazar, the Interior Board of Land Appeals ("IBLA"), the Bureau of Land Management ("BLM"), BLM Director Jim Caswell, BLM State Director Mike Pool, BLM Redding Field Office Manager Steven W. Anderson (collectively, "Federal Defendants"), Brent Owen, and Kimberly D. Hawkins (together, "Private Defendants"), alleging violations of the National Environmental Policy Act ("NEPA"), 43 U.S.C. §§ 4331-4347, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785. Plaintiffs' allegations pertain to a 2006 land exchange between BLM and Private Defendants involving a 216 acre parcel of federal land in Shasta County, California ("Federal Parcel"), and a 566 acre parcel of private land in Trinity County, California ("Non-Federal Parcel"). Presently before the court are plaintiffs' motion for summary judgment and defendants' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.

I.   Factual and Statutory Background

   A.   The Federal and Non-Federal Parcels

      The Federal Parcel is situated west of the city of Redding in Shasta County, California. (Admin. R. ("AR") 397.) The parcel is surrounded by private residential properties, and as of April 2006, approximately 200 homes were within a one-mile radius of the property. (Id.) The property has been used primarily by adjacent landowners whose backyards abut the public land. (Id. at 403.) Motorized vehicles, mountain bikes, and

2

pedestrian activity have created trails on the parcel, which have become popular with nearby residents and trail enthusiasts for walking, jogging, and mountain biking. (_Id._)

A seasonal, intermittent stream called Salt Creek also traverses through portions of the Federal Parcel. (_Id._) BLM and the California Department of Fish and Game have identified steelhead trout and chinook salmon as threatened or potentially threatened species that are known or reasonably expected to inhabit Salt Creek. (_Id._ at 400.) Thirteen recorded archeological sites also dot the land, including cabin foundations, minor ditches, and mine workings, although none of the recorded sites were deemed eligible for inclusion in the National Register of Historic Places. (_Id._ at 399.)

The Non-Federal Parcel is situated within the Grass Valley Creek ("GVC") Watershed in Trinity County, California. (_Id._ at 397.) GVC is a major tributary of the Trinity River and flows year round through portions of the property, providing a habitat for seven species of fish including steelhead trout, rainbow trout, chinook salmon, and coho salmon. (_Id._ at 397, 400.)

The property is situated on the Shasta Bally batholith, and the erosion of decomposing granite threatens the salmon and trout fisheries of the Trinity River. (_Id._ at 386.) The Trinity River Task Force, established in 1984 by the Trinity River Basin Fish and Wildlife Restoration Act and composed of state, federal, and county agencies and Native American tribes, has initiated several actions to prevent erosion in the GVC Watershed and restore nearby fisheries. (_Id._ at 386.)

The Non-Federal Parcel is zoned for timber production, and higher elevations on the property are dominated by a mixed conifer forest including ponderosa pine, douglas-fir, interior live oak, and black oak. (Id. at 397-98.) The scenic qualities of the property make it well-suited for recreational uses such as hunting, fishing, hiking, mountain biking, horseback riding, and camping. (Id. at 403.) BLM's development plans for the Non-Federal Parcel include a potential trail system, access points, and vehicle parking. (Id.)

B. NEPA

In NEPA, Congress declared a national policy of "creat[ing] and maintain[ing] conditions under which man and nature can exist in productive harmony." Or. Natural Desert Ass'n v. Bureau of Land Mgmt., 531 F.3d 1114, 1120 (9th Cir. 2008) (quoting 43 U.S.C. § 4331(a)) (alterations in original). This policy is realized "not through substantive mandates but through the creation of a democratic decisionmaking structure" that is "strictly procedural." Id. By mandating this decisionmaking structure, NEPA is intended to "ensure that [federal agencies] . . . will have detailed information concerning significant environmental impacts" and "guarantee[] that the relevant information will be made available to the larger [public] audience." Blue Mountains Biodiversity Project v. Blackwood, 171 F.3d 1208, 121 (9th Cir. 1998).

Under NEPA, before a federal agency takes a "'major [f]ederal action[] significantly affecting the quality' of the environment," the agency must prepare an Environmental Impact Statement ("EIS"). Kern v. U.S. Bureau of Land Mgmt., 284 F.3d

4

1062, 1067 (9th Cir. 2002) (quoting 43 U.S.C. § 4332(2)(C)). An
EIS is NEPA's "chief tool" and is "designed as an 'action-forcing
device to [e]nsure that the policies and goals defined in the Act
are infused into the ongoing programs and actions of the Federal
Government.'" Or. Natural Desert Ass'n, 531 F.3d at 1121
(quoting 40 C.F.R. § 1502.1) (alteration in original). Certain
federal actions categorically require the preparation of an EIS,
while others first require the agency to make a preliminary
determination as to whether the proposed action will
"significantly affect" the environment. Id.

To determine whether a proposed federal action will
have a "significant effect" on the environment, an agency must
prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4;
see Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000). If
the EA reveals that the proposed action will significantly affect
the environment, then the agency must prepare an EIS; otherwise,
the agency issues a Finding of No Significant Impact ("FONSI").
40 C.F.R. §§ 1501.4, 1508.9; see Metcalf, 214 F.3d at 1142.

C.    The FLPMA and the Redding Resource Management Plan

The FLPMA defines BLM's land management authority and
"establishes systems for information gathering and land use
planning." Or. Natural Desert Ass'n, 531 F.3d at 1117. The
FLPMA directs the Secretary of the Interior, who oversees the
BLM, to "develop, maintain, and, when appropriate, revise land
use plans which provide by tracts or areas for the use of the
public lands." 43 U.S.C. § 1712(a). These land use plans are
typically referred to as Resource Management Plans ("RMPs"). 43
C.F.R. § 1601.0-1.

In preparing an RMP, the FLPMA requires, among other things, that BLM "give priority to the designation and protection of areas of critical environmental concern" and "weigh long-term benefits to the public against short-term benefits." 43 U.S.C. § 1712(c). The preparation of an RMP is categorically considered a "major Federal action significantly affecting the quality of the human environment," and thus always requires the preparation of an EIS. <u>Kern</u>, 284 F.3d at 1066 (citing 43 C.F.R. § 1601.0-6).

In 1993, BLM issued the Redding RMP ("1993 RMP") and a corresponding EIS detailing the agency's intention to consolidate and restore certain federal lands in the GVC Watershed. (Fed. Defs.' Stmt. Undisputed Material Facts ("FUMF") Nos. 2, 7, 14.) Under this plan, BLM sought to group more than one thousand scattered parcels of federal land in the GVC Watershed by obtaining additional parcels in the area from private owners. (<u>Id.</u>) In doing so, BLM hoped to improve management efficiencies and further its goals of preventing erosion in the GVC Watershed and protecting anadromous fisheries in the Trinity River. (<u>Id.</u>)

As it acquired parcels in the GVC Watershed, BLM also sought to dispose of certain federal parcels that were near growing communities and seemed better suited for development. (<u>Id.</u> Nos. 10-11.) In light of these dual purposes of acquisition and disposal, land exchanges were BLM's preferred method for simultaneously furthering these goals. (<u>Id.</u> No. 9.) BLM also preferred land exchanges because the acquisition of GVC Watershed lands was not otherwise within BLM's budget. (<u>Id.</u>)

BLM developed the 1993 RMP and EIS over a period of four years. (<u>Id.</u> No. 4.) During that time, BLM held

6

approximately ten public meetings and made presentations to five separate county boards of supervisors. (Id.) Through these meetings, BLM sought to inform citizens and local elected officials regarding the implications of the plan and to solicit comments and alternatives. (Id. No. 5.) On October 1, 1992, BLM announced the availability of the RMP and EIS and provided a thirty-day protest period. (Id. No. 12.) The RMP and EIS identified the area containing the Federal Parcel in Shasta County as intended for disposal through a land exchange. (Id. No. 13.) Although some members of the community voiced concerns over the disposal of the Federal Parcel, BLM ultimately approved the RMP and EIS in June of 1993. (AR 780-82, 3355-56.)

Pursuant to the 1993 RMP, local interests had two years after the 1993 RMP was approved to submit Recreation and Public Purpose Act ("R&PP") applications to acquire any federal parcel identified for disposal before any other party could submit a land exchange application. (FUMF No. 18.) Because BLM did not receive any timely R&PP applications for the Federal Parcel, BLM segregated the Federal Parcel for disposal by exchange. (Id. No. 19.)

D.    The 2006 Land Exchange

On April 22, 2001, Salmon Creek Resources Inc. ("Salmon Creek") offered to exchange the Non-Federal Parcel for the Federal Parcel. (FUMF No. 20.) The RMP had identified the Non-Federal Parcel as a priority acquisition because it was the largest inholding within the eroded portion of the GVC Watershed. (Id. No. 21.) During the next five years, BLM analyzed and evaluated the proposed exchange, which included 12 public

7

meetings to solicit comments and alternatives, 529 letters and
responses, 22 newspaper articles, and a biological assessment and
consultation with other governmental agencies. (Id. Nos. 25-26.)
BLM received approximately 100 comments, primarily from
landowners near the Federal Parcel, which expressed concerns
regarding development of the Federal Parcel and the resulting
loss of open space and recreational use. (Id. No. 30.)

On April 26, 2006, BLM issued an EA with respect to the
proposed land exchange along with a FONSI and a Decision Record
to approve the exchange after a 45-day protest period. (Id. No.
48.) On May 1, 2006, BLM published a Notice of Decision in two
newspapers circulated near the Federal Parcel and invited
interested parties to submit written protests. (Id. No 49.) BLM
received and considered several protests but ultimately rejected
them. (Id. No. 50.)

Plaintiffs Shasta Coalition for the Preservation of
Public Land and Sacramento River Preservation Trust subsequently
filed appeals with the IBLA regarding the land exchange. (Id.
No. 53.) After permitting Salmon Creek to intervene, the IBLA
denied these appeals on September 28, 2007, and affirmed BLM's
Decision Record, finding that it complied with NEPA and the
FLPMA. (Id. Nos. 56-57.) Near this time, Salmon Creek assigned
its interest in the Federal Parcel to Private Defendants (AR
4269), and the following month BLM issued two land patents to
Private Defendants, transferring ownership of the Federal Parcel
and consummating the proposed exchange. (FUMF No. 59.)

Plaintiffs subsequently filed their Complaint in
federal court alleging that the land exchange between BLM and

8

Private Defendants violated NEPA and the FLPMA.  The parties now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

II.  <u>Discussion</u>

    A.   <u>Legal Standard</u>

        Although both NEPA and the FLPMA impose specific obligations upon federal agencies, the statutes do not create independent causes of action to enforce these requirements; rather, alleged violations of NEPA and the FLPMA are addressed when a party challenges a final decision by a federal agency pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  <u>Am. Sand Ass'n v. U.S. Dep't of the Interior</u>, 268 F. Supp. 2d 1250, 1253 (S.D. Cal. 2003); <u>see</u> <u>Ashley Creek Phosphate Co. v. Norton</u>, 420 F.3d 934, 939 (9th Cir. 2005) ("Because NEPA does not provide for a private right of action, plaintiffs challenging an agency action based on NEPA must do so under the [APA]." (citing <u>Sierra Club v. Penfold</u>, 857 F.2d 1307, 1315 (9th Cir. 1988))).

        Under the APA, a court may not set aside a federal agency's decision unless the decision is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A); <u>see</u> <u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360, 378 (1989).  In making this determination, a court "'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  <u>Marsh</u>, 490 U.S. at 378 (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971), <u>abrogated on other grounds by</u> <u>Califano</u>

v. Sanders, 430 U.S. 99, 105 (1977)).  "This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'"  Id.  In reviewing an agency's action, a court must be "highly deferential" to the agency.  Friends of the Earth v. Hintz, 800 F.2d 822, 831 (9th Cir. 1980).  A court "may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action."  Id.

Summary judgment is an appropriate procedural mechanism for reviewing agency decisions under the dictates of the APA. See, e.g., Nw. Motorcycle Ass'n. v. U.S. Dep't. of Agric., 18 F.3d 1468, 1471-72 (9th Cir. 1994).  Pursuant to Federal Rule of Civil Procedure 56, summary judgment must be granted if, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

When reviewing agency decisions the "evidence" a court may consider is generally limited the administrative record.  5 U.S.C. § 706; The Lands Council v. Powell, 395 F.3d 1019, 1029-30 (9th Cir. 2005).  Thus, when deciding motions for summary judgment in this context, a court's task "is not to resolve contested fact questions which may exist in the underlying administrative record," but rather to determine whether, in light of the record, the agency's decision was arbitrary and capricious under the APA.  Gilbert Equip. Co., Inc. v. Higgins, 709 F. Supp. 1071, 1077 (S.D. Ala. 1989), aff'd, 894 F.2d 412 (11th Cir. 1990); see Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769 (9th Cir. 1985).

1    B.    <u>Exhaustion Requirement</u>

2         "When the regulations governing an administrative

3    decision-making body require that a party exhaust its

4    administrative remedies prior to seeking judicial review, the

5    party must do so before the administrative decision may be

6    considered final and the district court may properly assume

7    jurisdiction." <u>Doria Mining & Eng'g Corp. v. Morton</u>, 608 F.2d

8    1255, 1257 (9th Cir. 1979) (citing, <u>inter alia</u>, 5 U.S.C. § 704);

9    <u>accord</u> <u>Quechan Indian Tribe v. United States</u>, 535 F. Supp. 2d

10   1072, 1088 (S.D. Cal. 2008).  Regulations of the Department of

11   the Interior require exhaustion of administrative remedies before

12   judicial review.  43 C.F.R. § 4.21(b); <u>see</u> <u>Wind River Mining</u>

13   <u>Corp. v. United States</u>, 946 F.2d 710, 712 n.1 (9th Cir. 1991).  A

14   plaintiff exhausts his or her administrative remedies under these

15   regulations "by petitioning the BLM and appealing its decision to

16   the IBLA."  <u>Wind River</u>, 946 F.2d at 712 n.1; <u>see</u> 43 C.F.R. §

17   4.21(b), (c).

18        Here, the administrative record indicates that

19   plaintiff Shasta Resources Council did not file an appeal with

20   the IBLA.  (<u>See</u> AR 4228-45.)  Nonetheless, defendants do not

21   contest that plaintiffs Shasta Coalition for Preservation of

22   Public Land and Sacramento River Preservation Trust exhausted all

23   requisite administrative remedies, and there is no dispute that

24   all plaintiffs raise identical claims and arguments.  Therefore,

25   since the purpose of the exhaustion requirement is to "ensure

26   that the agency possessed of the most expertise in an area be

27   given the first shot" at addressing an issue, the underlying

28   rationale of exhaustion has already been met in this case.  <u>Idaho</u>

Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th
Cir. 2002).  In addition, it would be futile to require a
plaintiff to exhaust its administrative remedies where doing so
would have no effect on the agency's response.  See Northcoast
Envtl. Ctr. v. Glickman, No. 95-38, 1996 U.S. Dist. LEXIS 22845,
at *9-11 (N.D. Cal. Aug. 16, 1996) (holding that, where at least
one plaintiff exhausted the relevant claims, "it would be futile
to require the remaining [plaintiffs] to so as well"), aff'd, 136
F.3d 660 (9th Cir. 1998).  Accordingly, the court declines to
dismiss plaintiff Shasta Resources Council as party to this
lawsuit.  See Sierra Club v. Bosworth, 465 F. Supp. 2d 931, 937
(N.D. Cal. 2006) (holding that "it is not necessary for all
plaintiffs to exhaust their administrative remedies insofar as at
least one plaintiff has put the Forest Service on notice of all
of the arguments and issues relevant here").

        C.    Analysis of Alternatives

        NEPA requires federal agencies to "study, develop, and
describe appropriate alternatives to recommended courses of
action in any proposal which involves unresolved conflicts
concerning alternative uses of available resources."  42 U.S.C. §
4332(2)(E).  This "alternatives provision" applies whether an
agency is preparing an EIS or an EA and requires the agency to
give full and meaningful consideration to all reasonable
alternatives.  Native Ecosystems Council v. U.S. Forest Serv.,
428 F.3d 1233, 1245 (9th Cir. 2005).  However, "an agency's
obligation to consider alternatives under an EA is a lesser one
than under an EIS."  Id. at 1246.  When an agency prepares an
EIS, the agency must "[r]igorously explore and objectively

                            12

evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), while in an EA, an agency "only is required to include a brief discussion of reasonable alternatives," <u>N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.</u>, 545 F.3d 1147, 1153 (9th Cir. 2008) (citing 40 C.F.R. § 1508.9(b)).

In evaluating the 2006 land exchange, BLM considered nine alternatives in the EA. (FUMF No. 63.) The EA described three alternatives in detail: (1) consummating the proposed land exchange, (2) taking no action, and (3) selling the Federal Parcel and acquiring the Non-Federal Parcel through other legal means. (<u>Id.</u> No. 67.) The EA also addressed the six other alternatives, but they were ultimately dismissed from further analysis after a brief discussion. (<u>Id.</u> Nos. 64-65.) These alternatives were (1) consummating the proposed land exchange with an easement in favor of BLM in order to protect trails on the Federal Parcel, (2) transferring an easement protecting trails on the Federal Parcel to a local interest, (3) transferring the Federal Parcel to a local interest through an R&PP, (4) transferring the Federal Parcel to a local interest through an exchange or sale, (5) retaining the Federal Parcel, or (6) modifying the proposed land exchange to include different federal lands. (<u>Id.</u> No. 64.)

In their motion for summary judgment, plaintiffs contend that the EA failed to sufficiently analyze the possibility of (1) transferring an easement protecting trails on the Federal Parcel to a local interest, (2) selling the Federal Parcel to a local interest, or (3) purchasing the Non-Federal Parcel through the Federal Land Transaction Facilitation Act or

the Federal Land and Water Conservation Fund Act. (Pls.' Mot. Summ. J. 5-9.)

### 1. The Local-Easement Alternative

In dismissing the possibility of transferring an easement protecting the trails on the Federal Parcel to local interests, the EA stated that this encumbrance would reduce the property's potential for residential development. (AR 393-94.) Consequently, this proposed alternative would have required a revised appraisal of the Federal Parcel and would have potentially reduced its value. (AR 393-94.) This alternative, therefore, risked violating the "exchange equalization" requirement[1] and rendering the land exchange unfeasible. (Id. at 393.) Furthermore, because the 1993 RMP stated that "land use authorizations which reduce the marketability of an exchange parcel [would] not be authorized," the EA also found that the proposed encumbrance would conflict with the dictates of the 1993 RMP. (Id.)

To challenge BLM's dismissal of this alternative, plaintiffs first contend that BLM took an impermissibly narrow view of the project's purpose. Specifically, plaintiffs argue that the reasons given in the EA for dismissing the local easement alternative effectively required the proposal to comport with the desired land exchange. Plaintiffs assert that such an

---

[1] In a land exchange of federal and non-federal parcels, the difference in value between the non-federal and federal parcels must not exceed twenty-five percent of the value of the federal parcel. (Id. at 389.) Any difference in value may be paid by the holder of the non-federal parcel or BLM as long as it is within twenty-five percent of the value of the federal parcel. (Id.)

14

approach is foreclosed by case law.  See Muckleshoot Indian Tribe
v. U.S. Forest Serv., 177 F.3d 800, 814 n.7 (9th Cir. 1999)
(providing that a "statement of purpose" for a transaction that
"limit[ed] the transaction to land-for-land exchanges" would
"certainly be too narrow"); City of Carmel-By-The-Sea v. U.S.
Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997) ("The
stated goal of a project necessarily dictates the range of
'reasonable' alternatives and an agency cannot define its
objectives in unreasonably narrow terms.").

        A close review of the rationale for dismissing the
local easement alternative indicates that the EA did not
effectively exclude non-land exchange alternatives from
consideration.  The EA's concern that an encumbrance preserving
the trails on the Federal Parcel would inhibit the disposal of
the property and any future residential development, while
implicitly favoring the proposed land exchange, did not preordain
that result.

        One of the primary objectives of the 1993 RMP was the
"dispos[al] of [federal] lands identified in the RMP as surplus"
because they were "difficult to manage," had "limited resource
value," and were better suited for residential development.  (AR
389-90, 395, 410.)  In light of this objective, the 1993 RMP
expressly provided that "land use authorizations which reduce the
marketability of an exchange parcel will not be authorized." (AR
3378.)  Consistent with the 1993 RMP, BLM reasonably concluded
that the encumbrance resulting from the local easement
alternative would inhibit or unreasonably delay disposal of the
property, whether by land exchange or sale of the parcel.  (See

EA 387 (noting that the 1993 RMP permitted disposal of identified
federal lands through land exchange or sale).) See generally
Envtl. Prot. Info. Ctr. v. Blackwell, 389 F. Supp. 2d 1174, 1202
(N.D. Cal. 2004) ("[A]n alternative may be rejected because it
does not meet the stated purposes and needs for the proposed
action.") (citing, inter alia, Hells Canyon Alliance v. U.S.
Forest Serv., 227 F.3d 1170, 1181 (9th Cir. 2000)).

Furthermore, given the dictates of the 1993 RMP, it is
eminently probable that the local easement alternative was
precluded by statute. See 43 U.S.C. 1732(a) ("The Secretary
shall manage the public lands . . . in accordance with the land
use plans developed by him under section 1712 . . . ." (emphasis
added)); Utah Shared Access Alliance v. Carpenter, 463 F.3d 1125,
1129 (10th Cir. 2006) ("FLPMA prohibits the BLM from taking
actions inconsistent with the provisions of RMPs." (citing Norton
v. S. Utah Wilderness Alliance, 542 U.S. 55, 69 (2004); 43 U.S.C.
§ 1732(a); 43 C.F.R. § 1610.5-3)); Klamath Siskiyou Wildlands
Ctr. v. Boody, 468 F.3d 549, 557 (9th Cir. 2006) (providing that
"provisions of FLPMA . . . require BLM to manage public lands in
accordance with resource management plans once they have been
established").  Plaintiffs did not formally challenge the 1993
RMP when it was issued fifteen years ago (AR 43, 933, 1583-84),
and any new challenge to its provisions would be untimely under
the APA's six-year statute of limitations.  See 5 U.S.C. § 704;
28 U.S.C. § 2401(a).

Accordingly, in dismissing the local easement
alternative, BLM's rationale did not effectively foreclose any
non-land exchange proposal.  Rather, the reasons given in the EA

16

for dismissing the local easement alternative show that BLM
reasonably found the proposal to be inconsistent with the 1993
RMP's objectives.  As the Ninth Circuit has repeatedly held,
"[a]n agency is under no obligation to consider . . .
alternatives that are unlikely to be implemented or those
inconsistent with its basic policy objectives."  <u>Seattle Audubon</u>
<u>Soc'y v. Moseley</u>, 80 F.3d 1401, 1404 (9th Cir. 1996) (per curiam)
(citing <u>Res. Ltd., Inc. v. Robertson</u>, 8 F.3d 1394, 1401-02 (9th
Cir. 1993); <u>Headwaters v. Bureau of Land Mgmt.</u>, 914 F.2d 1174,
1180-81 (9th Cir. 1990)).

  Plaintiffs' remaining challenge to BLM's dismissal of
the local easement alternative relies exclusively on the Ninth
Circuit's decision in <u>Muckleshoot Indian Tribe v. U.S. Forest</u>
<u>Service</u>, 177 F.3d 800 (9th Cir. 1999).  <u>Muckleshoot</u> involved a
land exchange in Washington state between the Forest Service and
a large logging corporation.  <u>Id.</u> at 804.  In that exchange, the
Forest Service received 30,253 acres of land in Mount Maker
National Forest in exchange for 4362 acres of land in the
Huckleberry Mountain area.  <u>Id.</u>  The land conveyed by the Forest
Service included the Huckleberry Divide Trail, "a site important
to the [Muckleshoot Indian] Tribe and that the Forest Service
found eligible for inclusion in the National Register for
Historic Preservation."  <u>Id.</u>

  Before consummating the exchange, the Forest Service
"preliminarily eliminated from detailed study" an alternative
that "would have placed deed restrictions on the land traded . .
. requiring that the lands be managed under National Forest
Service standards."  <u>Id.</u> at 813.  The Forest Service rejected the

17

proposal "on the grounds that it would decrease [the corporate party's] incentive to trade." Id. The Ninth Circuit, however, found "nothing in the record to demonstrate that the Forest Service . . . considered increasing [the corporate party's] incentive to trade" by offering additional acreage or decreasing the amount of land the Forest Service required. Id. The Ninth Circuit concluded that the Forest Service's failure to consider this alternative in more detail violated NEPA. Id.

Plaintiffs argue that the EA in this case, by failing to consider incentives that would permit exchanging the Federal Parcel with an easement, also violated NEPA's procedural requirements. A close examination of Muckleshoot's reasoning, however, indicates that BLM's actions are distinguishable.

First, in Muckleshoot, the Ninth Circuit was reviewing an EIS, see id. at 812, while in the instant case, plaintiffs challenge the adequacy of an EA. As mentioned previously, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." Native Ecosystems Council, 428 F.3d at 1246. Although the preparation of an EIS obligates an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives," see 40 C.F.R. § 1502.14(a), an EA need only "include a brief discussion of reasonable alternatives." N. Idaho Cmty. Action Network, 545 F.3d at 1153. Therefore, while the Muckleshoot court criticized the Forest Service for failing to consider whether additional incentives could make an easement alternative feasible, that decision provides little support for

18

requiring similar rigor in the instant case.[2]

Muckleshoot's rationale, moreover, suggests that the obligations imposed upon the Forest Service were the product of unique circumstances. The Muckleshoot court began its discussion by acknowledging that "NEPA does not require the Forest Service to 'consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives.'" Muckleshoot, 177 F.3d at 813 (quoting Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401, 1404 (9th Cir. 1996) (per curiam)). That court then deviated from this deferential approach only when it proclaimed,

> [W]e are troubled that in this case, the Forest Service failed to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration. . . . A detailed consideration of a trade involving deed restrictions or other modifications to the acreage involved is in the public interest and should have been considered.

Id.

The Muckleshoot court found that the proposed deed restrictions were "more consistent with [the Forest Service's] basic policy objectives" and were "in the public interest" because these restrictions would protect the Huckleberry Divide

---

[2] Plaintiffs contend that BLM should have issued an EIS rather than an EA for the 2006 land exchange. (Pls.' Mot. Summ. J. 4.) As discussed infra in Section II.D, however, plaintiffs fail to demonstrate that BLM's issuance of an EA and a FONSI in lieu of an EIS was arbitrary and capricious. See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1536 (9th Cir. 1997) ("We review [the] decision not to prepare an EIS under an 'arbitrary and capricious' standard of review." (citing Greenpeace Action v. Franklin, 14 F.3d 1324 (9th Cir. 1993))).

Trail, "a site important to the [Muckleshoot Indian] Tribe and that the Forest Service found eligible for inclusion in the National Register for Historic Preservation." Id. at 804. In this case, however, protection of the trails on the Federal Parcel is neither demonstrably more consistent with BLM's "basic policy objectives" nor "in the public interest."

The administrative record indicates that the unauthorized trails on the Federal Parcel are used primarily by adjacent landowners whose backyards abut the public lands. (AR 403.) The trails meander throughout the central portion of the property and are disconnected from other trails; they are detached from the greater Redding area for purposes of recreational use, and require users to walk, bike, or ride horseback for long distances on paved streets to reach any point of interest. (AR 356, 393, 403, 428, 429, 948, 1552, 1567-68, 1751.) Adjoining neighbors have filed numerous complaints of noise, shooting, and dumping on the Federal Parcel, and the property has been closed to highway-vehicle use due to these complaints. (Id. at 403.) Some portions of the trails also interfere with the proper functioning of drainages. (Id. at 356, 403, 420, 428, 948, 1567-68.)

In addition, if the tangled network of trails were preserved through an easement, the BLM reasonably concluded that the encumbrance would limit residential development on the Federal Parcel. (Id. at 393.) This result would clearly conflict with BLM's perception of the public interest. (See, e.g., id. at 395 ("The [1993 RMP] analyzed retention and disposal of the lands including the subject parcels and determined that

20

retention of the Federal [P]arcel was not in the public interest
due to its location within an urban expansion zone.  Market
forces are even greater today than in 1993 when the RMP was
approved.  The pattern of growth in west Redding confirms those
predictions of the [1993 RMP]."); id. at 410 ("Considering the
highest and best use of the [Federal Parcel], the most likely
consequence of the proposed action is rural residential
development.").)

          Finally, in Muckleshoot, counsel for the corporate
party conceded that "the imposition of deed restrictions was a
viable alternative to the Exchange Agreement."  177 F.3d at 814.
Thus, the imposition of deed restrictions was an alternative
"that could not be ignored" because "'[a] viable but unexamined
alternative renders [an] environmental impact statement
inadequate.'"  Id. (quoting Citizens for a Better Henderson v.
Hodel, 768 F.2d 1051, 1057 (9th Cir. 1985)).  In this case,
however, it is far from evident that transferring an easement on
the Federal Parcel to a local interest was a "viable
alternative."  As mentioned previously, the 1993 RMP provided
that "land use authorizations which reduce the marketability of
an exchange parcel will not be authorized."  (AR 3378.)  The
FLPMA, moreover, "prohibits the BLM from taking actions
inconsistent with the provisions of RMPs."  Utah Shared Access
Alliance v. Carpenter,  463 F.3d 1125, 1129 (10th Cir. 2006)
(citing Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 69
(2004); 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3).  Therefore,
instead of presenting a "viable alternative," the proposed
easement in this case appears to have been foreclosed by statute.

21

Accordingly, because the local easement alternative was not demonstrably more consistent with BLM's "basic policy objectives" or in the public interest, BLM's election to briefly discuss and dismiss this alternative in the EA was neither arbitrary and capricious nor contrary to law.

2.  The Local-Sale Alternative

Plaintiffs also argue that BLM failed to adequately consider selling the Federal Parcel to local interests. (Pls.' Mot. Summ. J. 8-9.)  A review of the administrative record, however, indicates that BLM provided sufficient consideration to this alternative to satisfy the APA's deferential standard of review.

The EA explained that the 1993 RMP permitted local interests to submit R&PP applications within two years of the 1993 RMP. (AR 394.)  No application or expression of interest was received during that time. (Id.)  In 2002, Shasta County Community Services District ("SCCSD") expressed an interest in acquiring the Federal Parcel through the R&PP process, but was admittedly unable to submit a formal proposal due to lack of funding. (Id. at 1937-38.)  BLM subsequently met with SCCSD and local residents to discuss their interest in acquiring the property, but SCCSD did not submit a formal proposal. (Id. at 44, 436.)  In 2003, SCCSD issued a letter expressing interest in acquiring the Federal Parcel, but stated that it did not plan to seek funding until it confirmed that any conveyance was likely. (Id. at 44.)  BLM then met with SCCSD and other community members in May 2003, and SCCSD again confirmed that no funding was available for SCCSD's proposal. (Id. at 44, 436, 978.)

In 2004, SCCSD and the Trails and Bikeway Council submitted a joint R&PP application, but BLM found that the application failed to meet the requirements of 43 C.F.R. § 2741.4; namely, the application did not contain a detailed plan, schedule for development, management plan, description of how revenues would be used, or commitment for funding. (Id. at 44, 394, 436, 1901.)

In 2005, plaintiff Shasta Resources Council ("SRC") submitted a letter expressing an interest in acquiring the Federal Parcel. (Id. at 931, 1018, 4438.) Specifically, SRC planned to form a non-profit group and assessment district that would finance acquisition and management of the Federal Parcel. (Id. at 45.) SRC, however, never obtained non-profit status, an assessment district was not formed, and SRC stated in May 2005 that it did not have the resources to financially or physically manage the Federal Parcel. (Id. at 931, 1018, 4438.)

In 2006, SRC then proposed a transaction in which BLM would act as a holding company while SRC sold ten to twenty percent of the Federal Parcel for development and used the proceeds to acquire the remaining eighty to ninety percent of the property. (Id. at 2013.) Alternatively, SRC proposed that it could acquire the Non-Federal Parcel and become the exchange proponent. (Id.) BLM dismissed the first proposal upon finding no federal law granting BLM the power to transfer public land to a private party with the expectation of future compensation. (Id.) As to the second proposal, BLM had no authority to facilitate the sale of the Non-Federal Parcel between private parties, and at any rate, SRC and the owner of the Non-Federal

23

Parcel ultimately could not reach an agreement. (Id. at 2013, 1961, 1968, 1979, 1982.)[3]

In their motions, plaintiffs concede that BLM was not required "to chase down every offer to purchase land from it" and that "some offers may not have conformed to every technical requirement." (Pls.' Opp'n Fed. Defs.' Cross-Mot. Summ. J. 7.) Nonetheless, plaintiffs insist that BLM was obligated "to work with local groups to remedy those deficiencies." (Id. at 8.)  In support of their position, however, plaintiffs fail to cite any legal authority that would require BLM to not only consider reasonable alternatives to its proposed action, but also to assist third-parties in fashioning their own alternative proposals.  Plaintiffs provide no evidence that BLM intentionally thwarted proposals from the community or otherwise acted in bad faith; rather, the administrative record suggests that BLM was receptive to several members of the community who expressed interest in purchasing the property.

Ultimately, this court's review under the APA is limited to whether BLM's decision not to sell the Federal Parcel to local interests was "'arbitrary, capricious, an abuse of

---

[3]     Two months after BLM had issued the EA, FONSI, and Decision Record, SRC submitted another acquisition proposal that SRC characterized as "fully funded."  (Id. at 1942.)  However, plaintiffs cannot now be heard to criticize the EA for failing to adequately examine an alternative that was not before the BLM at the time it rendered its decision.  See, e.g., The Lands Council v. Powell, 395 F.3d 1019, 1029-30 (9th Cir. 2005) ("'Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court.'" (quoting Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996))).

discretion, or otherwise not in accordance with the law.'" <u>W.</u>
<u>Radio Servs. Co., Inc. v. Espy</u>, 79 F.3d 896, 900 (9th Cir. 1996)
(quoting 5 U.S.C. § 706(2)(a)); <u>accord</u> <u>Idaho Farm Bureau Fed'n v.</u>
<u>Babbitt</u>, 58 F.3d 1392, 1401 (9th Cir. 1995).  Given this
deferential standard and in light of the administrative record in
this case, the court cannot conclude that BLM "entirely failed to
consider" the local-sale alternative, <u>Espy</u>, 79 F.3d at 900, or
that its consideration of this alternative evinced a "'clear
error of judgment' that would render its action 'arbitrary and
capricious.'"  <u>The Lands Council v. McNair</u>, 537 F.3d 981, 993
(9th Cir. 2008) (en banc) (citing <u>Marsh v. Or. Natural Res.</u>
<u>Council</u>, 490 U.S. 360, 376 (1989)).

            3.  <u>The Purchase Alternative</u>

        Plaintiffs finally argue that BLM did not adequately
consider purchasing the Non-Federal Parcel with federal funds as
an alternative to the proposed land exchange.[4]  Specifically,

---

            [4]  In a footnote, Federal Defendants assert that this
argument was not brought before BLM and the IBLA during the
administrative process.  (Fed. Defs.' Cross-Mot. Summ. J. 16
n.9.)  Although "persons challenging an agency's compliance with
NEPA must structure their participation so that it . . . alerts
the agency to the parties' position and contentions," the Ninth
Circuit has long permitted plaintiffs "to raise arguments . . .
where they 'presented a much less refined legal argument in their
administrative appeal.'"  <u>Great Basin Mine Watch v. Hankins</u>, 456
F.3d 955, 965 (9th Cir. 2006) (quoting <u>Native Ecosystems Council</u>
<u>v. Dombeck</u>, 304 F.3d 886, 891 (9th Cir. 2002)).  It is undisputed
that the appeal before the IBLA challenged BLM's consideration of
alternatives to the 2006 land exchange (AR 4232, 4242-44), and
although the IBLA's written decision did not discuss the
"purchase alternative" as such, defendants were clearly on notice
of plaintiffs' general claim.  <u>See</u> <u>Idaho Sporting Congress, Inc.</u>
<u>v. Rittenhouse</u>, 305 F.3d 957, 965 (9th Cir. 2002) ("Claims must
be raised with sufficient clarity to allow the decision maker to
understand and rule on the issue raised, but there is no
bright-line standard as to when this requirement has been met . .
. .").  Accordingly, the court will proceed to address this
argument.

plaintiffs contend that BLM should have further analyzed the
possibility of selling the Federal Parcel and purchasing the Non-
Federal Parcel in a separate transaction through either the
Federal Land Transaction Facilitation Act ("FLTFA") or the
Federal Land and Water Conservation Fund Act ("FLWCFA"). (Pls.'
Opp'n Fed. Defs.' Mot. Summ. J. 4-5.)

Congress passed the FLTFA in July of 2000, which
permitted the Secretaries of the Interior and Agriculture to
retain a percentage of land-sale proceeds in order to purchase
lands within certain federally designated areas. See 43 U.S.C.
§§ 2301-2306. As the BLM discussed in its Decision Record,
however, the Non-Federal Parcel contained within the GVC
Watershed did not qualify as a "federally designated area" under
the FLTFA. (See AR 451.) See generally 43 U.S.C. § 2302(2).
Accordingly, BLM was not obligated to consider this alternative
any further. See, e.g., N. Alaska Envtl. Ctr. v. Kempthorne, 457
F.3d 969, 978 (9th Cir. 2006) ("An agency need not . . . discuss
. . . alternatives which are 'infeasible[ or] ineffective' . . .
."); Sierra Club v. United States, 23 F. Supp. 2d 1132, 1144
(N.D. Cal. 1998) ("An agency 'is under no obligation to consider
every possible alternative to a proposed action, nor must it
consider alternatives that are unlikely to be implemented . . .
.'" (quoting Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401, 1404
(9th Cir. 1996) (per curiam)).

Again relying on Muckleshoot, plaintiffs also contend
that BLM inadequately considered the FLWCFA as a potential source
of federal funds for acquiring the Non-Federal Parcel. (Pls.'
Mot. Summ. J. 8.) Congress passed the FLWCFA in 1965 in order to

designate a portion of receipts from offshore oil and gas leases to be placed into a fund for state and local conservation. Bradley C. Karkkainen, <u>Biodiversity and Land</u>, 83 <u>Cornell L. Rev.</u> 1, 18 n.81 (1997). Although BLM does not have the authority to appropriate funds under the FLWCFA, it can request them from Congress. (<u>See</u> AR 451.)

In the past, courts have recognized that "even if an alternative requires 'legislative action[,]' this fact 'does not automatically justify excluding it from an EIS.'" <u>City of Sausalito v. O'Neill</u>, 386 F.3d 1186, 1208 (9th Cir. 2004) (quoting <u>Methow Valley Citizens Council v. Reg'l Forester</u>, 833 F.2d 810, 815 (9th Cir. 1987)). Nonetheless, the Ninth Circuit also cautioned that, "[i]f an alternative requires congressional action, it will qualify for inclusion in an EIS only in very rare circumstances" and specifically identified <u>Muckleshoot</u> as one of these "very rare" instances. <u>Id.</u> (citing <u>City of Angoon v. Hodel</u>, 803 F.2d 1016, 1022 n.2 (9th Cir. 1986)). As mentioned previously, this line of caselaw has also applied exclusively to the EIS context; thus, any obligation to pursue congressional approval would be "a lesser one" under an EA. <u>Native Ecosystems Council v. U.S. Forest Serv.</u>, 428 F.3d 1233, 1245 (9th Cir. 2005).

While acknowledging that the Non-Federal Parcel "could theoretically be accomplished by [FLWCFA] appropriations," BLM found that

> this likelihood [was] remote because of the small total amount of available [FLWCFA] funds and competition from numerous projects that already enjoy specific [f]ederal designations. . . . Availability of funds . . . would be unpredictable and likely face intense competition. The

present owner of the [N]on-Federal land is unlikely to remain a willing seller for an indefinite period.

(AR 451.)  In <u>Muckleshoot</u>, the Ninth Circuit did not fault the Forest Service for failing to request FLWCFA appropriations; rather, the <u>Muckleshoot</u> court found that "this option was not even considered."  177 F.3d at 814.  Clearly, BLM "considered" this possibility in the instant case, and the "brief discussion" pertaining to this alternative would appear to satisfy NEPA's requirements as they pertain to an EA.  See <u>N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.</u>, 545 F.3d 1147, 1153 (9th Cir. 2008) (providing that an EA "only is required to include a brief discussion of reasonable alternatives" (citing 40 C.F.R. § 1508.9(b))).

In addition, although the Ninth Circuit in <u>Muckleshoot</u> rejected the Forest Service's characterization of FLWCFA funds as "remote and speculative," 177 F.3d at 814, BLM's conclusion in this case that such funding was "remote" and "unpredictable" is not undeserving of deference.  Rather, as subsequent case law has clarified, the <u>Muckleshoot</u> court was particularly concerned with the apparent duplicity of the Forest Service's explanations; the EIS in that case "explicitly and frequently relied upon 'admittedly speculative funds' for financing," and therefore the court was "'troubled by this selective willingness to rely upon the availability of funding sources beyond the Forest Service's direct control.'"  <u>City of Sausalito</u>, 386 F.3d at 1209 (quoting <u>Muckleshoot</u>, 177 F.3d at 814).  In contrast, plaintiffs have not suggested that BLM is "selectively" willing to rely on speculative contingencies in its proposed land exchange while

28

rejecting other alternatives on this same basis. <u>See generally</u>
<u>Envtl. Prot. Info. Ctr. v. Blackwell</u>, 389 F. Supp. 2d 1174, 1203
(N.D. Cal. 2004) ("[T]his case is not comparable to those in
which courts have found the alternatives skewed in favor of a
certain result." (citing, <u>inter alia</u>, <u>Muckleshoot</u>, 177 F.3d at
813)).

Finally, the court cannot discount BLM's concern that
the additional time and resources necessary for pursuing FLWCFA
appropriations would jeopardize Salmon Creek's willingness to
enter into any transaction with BLM. (<u>See</u> AR 451; <u>see also</u> <u>id.</u>
at 396 (noting that there had been "a time investment of
approximately five years in processing the current exchange
proposal").) As mentioned previously, the 1993 RMP had
identified the Non-Federal Parcel as a priority acquisition
because it was the largest inholding within the eroded portion of
the GVC Watershed. (FUMF No. 21.) Although BLM concedes that
FLWCFA funding was a theoretical possibility, the additional time
and resource requirements to further analyze this alterative, as
well as the risk of forfeiting the Non-Federal Parcel in the
process, required striking a balance that this court cannot
secondguess. <u>See</u> <u>Churchill County v. Norton</u>, 276 F.3d 1060, 1072
(9th Cir. 2001) ("We are not free to 'impose upon the agency
[our] own notion of which procedures are "best" or most likely to
further some vague, undefined public good.'" (quoting <u>Vt. Yankee</u>
<u>Nuclear Power Corp. v. Natural Res. Def. Council, Inc.</u>, 435 U.S.
519, 549 (1978))); <u>cf.</u> <u>Hells Canyon Alliance v. U.S. Forest</u>
<u>Serv.</u>, 227 F.3d 1170, 1181 (9th Cir. 2000) (upholding the Forest
Service's rejection of an alternative that failed to "satisfy the

29

agency's reasonable goal of striking an appropriate balance
between recreational and ecological values").

C.  Environmental Impacts

        "In determining whether a federal action requires an
EIS because it significantly affects the quality of the human
environment, an agency must consider what 'significantly' means."
Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 865
(9th Cir. 2005).  Federal regulations promulgated pursuant to
NEPA have identified ten factors "that help inform the
'significance' of a project."  Id.; see 40 C.F.R. § 1508.27(b).
Any one of these factors "may be sufficient to require
preparation of an EIS in appropriate circumstances."  Ocean
Advocates, 402 F.3d at 865 (citing Nat'l Parks & Conservation
Ass'n v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001)).

        Here, plaintiffs contend that BLM's decision to issue
an EA and FONSI in lieu of an EIS was arbitrary and capricious in
light of the alleged paucity of BLM's cumulative-impact analysis,
40 C.F.R. § 1508.27(b)(7), and BLM's alleged failure to
adequately examine impacts to threatened and endangered species,
id. § 1508.27(b)(9).  (Pls.' Mot. Summ. J. 10-13.)

        1.  Cumulative-Impact Analysis

        "Cumulative impact" is defined as "the impact on the
environment which results from the incremental impact of the
action when added to other past, present, and reasonably
foreseeable future actions regardless of what agency . . . or
person undertakes such other actions."  40 C.F.R. § 1508.7.  In a
cumulative-impact analysis, an agency must provide "'some
quantified or detailed information; . . . [g]eneral statements

30

about possible effects and some risk'" are insufficient.  <u>Ocean</u>
<u>Advocates</u>, 402 F.3d at 868 (9th Cir. 2005) (quoting <u>Neighbors of</u>
<u>Cuddy Mountain v. U.S. Forest Serv.</u>, 137 F.3d 1372, 1379-80 (9th
Cir. 1998)).

     In BLM's cumulative-impact analysis, the agency
"tiered" its EA to the EIS that accompanied the 1993 RMP.  (<u>See,</u>
<u>e.g.</u>, AR 409-10, 434.)  "Tiering" is defined in NEPA's
regulations as "the coverage of general matters in broader
environmental impact statements . . . with subsequent narrower
statements or environmental analyses (such as . . . site-specific
statements) incorporating by reference the general discussions
and concentrating solely on the issues specific to the statement
subsequently prepared."  40 C.F.R. § 1508.28.  "Agencies are
encouraged to tier their environmental impact statements to
eliminate repetitive discussions of the same issues and to focus
on the actual issues ripe for decision at each level of
environmental review."  <u>Id.</u> § 1502.20.

     The EIS accompanying the 1993 RMP broadly assessed the
environmental consequences of BLM's plan to manage over 9.914
million acres in northern California, including all of greater
Redding and the Federal Parcel.  (AR 3440-41.)  This assessment
described the anticipated effects of BLM's "Land Tenure
Adjustment" policy, which called for the disposal of certain
federally owned parcels.  (<u>Id.</u> at 3443.)  To carry out this
analysis, the EIS assumed that most of the federal land
transferred to private ownership in the Redding area would be
subject to residential development.  (<u>Id.</u> at 3577.)  The EIS then
proceeded to provide a thorough analysis, at a programmatic

level, of the anticipated environmental consequences of
development in the region.  (See AR 3573-3624.)

Relying on <u>Klamath-Siskiyou Wildlands Ctr. v. Bureau of
Land Management</u>, 387 F.3d 989 (9th Cir. 2004), plaintiffs contend
that BLM impermissibly tiered the EA to the EIS because the EIS
did not discuss "'<u>specific</u> information about the [] effects' of
the action considered in the EA." (Pls.' Mot. Summ. J. 14
(quoting <u>Klamath-Siskiyou</u>, 387 F.3d at 997).)  Plaintiffs'
argument, however, seems to misconstrue the concept of tiering.
The EIS was not required to contain site-specific information;
rather, tiering permits an EIS to address broad cumulative
impacts on a programmatic level, leaving site specific impacts to
be discussed in an EA.  See 40 C.F.R. § 1502.20.  In <u>Klamath-
Siskiyou</u>, the Ninth Circuit had already determined that the EAs
in that case did not contain adequate site-specific information,
and for that reason the court looked to the EIS for site-specific
information as a last resort.  See <u>Klamath-Siskiyou</u>, 387 F.3d at
997 ("Neither in the RMP-EIS nor in the EAs does the agency
reveal the incremental impact that can be expected . . . as a
result of each of <u>these</u> four successive timber sales.").

Unlike the situation in <u>Klamath-Siskiyou</u>, the EA in
this case did not rely upon the EIS in order to conduct its site-
specific cumulative-impact analysis.  First, the EA properly
acknowledged that any analysis of future development on the
Federal Parcel was inherently speculative.  (AR 434); see <u>The
Lands Council v. McNair</u>, 537 F.3d 981, 1001 (9th Cir. 2008) (en
banc) ("We have previously faulted the Forest Service for not
addressing uncertainties relating to a project 'in any meaningful

32

way' . . . ."). The EA then proceeded to conclude that
development of the property would likely have similar
consequences as the development of other federal lands that had
been transferred to private ownership in the region. (AR 434.)
At the time, approximately 750 acres of federal land in west
Redding had been transferred to private ownership in the previous
ten years, and the EA predicted that 500 acres would be
transferred in the next ten years. (Id. at 435.)

The EA identified the following adverse incremental
effects of the disposal and subsequent development of the Federal
Parcel: increased noise, traffic, vehicle emissions, dust, soil
erosion, and runoff; loss of open space and trails; reduction of
scenic quality; and impacts to fish and wildlife habitats and
historical sites. (AR 434.) The EA separately examined each of
these effects in additional detail. (See AR 416 (air quality);
id. at 417 (cultural resources); id. at 418 (fisheries); id. at
420 (recreation); id. at 421 (scenic quality); id. at 422 (soils
(erosion potential)); id. at 423 (terrestrial special status
species); id. at 424 (traffic); id. (water quality); id. at 425
(wetlands/riparian zones); id. (wildlife).)

To determine the extent of these incremental impacts,
the EA assumed that fifty-nine homes would be developed on the
Federal Parcel. (AR 410.) This number represented the most
intensive development scenario, which would require an amendment
to the Shasta County General Plan and a zoning amendment and also
ignored certain obstacles to intensive development related to the
property's location, soil, and slope. (Id.) This scenario was
submitted to the Shasta County Department of Resource Management

33

in the form of a pre-application for subdivision development.
(Id.)  The County's response similarly indicated that such
intensive development was unlikely.  (Id. at 412; see also id. at
1760-61.)  The County also indicated that environmental impacts
would be further limited by state and local environmental laws,
such as the California Environmental Quality Act ("CEQA"), Cal.
Pub. Res. Code §§ 21000-21177.  (Id. at 411.)  As plaintiffs
acknowledge, an agency may "rely on local land use and zoning
regulations to determine whether an EIS is required."  (Pls.'
Mot. Summ. J. 12); see Lodge Tower Condo. Ass'n v. Lodge Props.,
Inc., 880 F. Supp. 1370, 1384 (D. Colo. 1995) ("[T]he agency can
consider existing zoning, building, and view ordinances in
evaluating whether an impact is so significant as to require an
EIS, since those existing ordinances are part of the factual
background against which the agency evaluation is made." (citing
Lockhart v. Kenops, 927 F.2d 1028, 1033 (8th Cir. 1991))).
Ultimately, after assessing the type and extent of potential
environmental impacts, the EA concluded that these effects were
not sufficiently significant to warrant the creation of an EIS.
(AR 434-35, 445-47.)

        Ironically, plaintiffs level nebulous criticisms at the
EA for having a "paucity of detailed analysis," making "vague
assertions," and lacking in "'quantified or detailed
information.'"  (Pls.' Mot. Summ. J. 11 (quoting
Klamath-Siskiyou, 387 F.3d at 993).)[5]  Although the purpose of

_____

        [5]    At oral argument, plaintiffs' counsel repeatedly
asserted that the EA's cumulative-impact analysis consisted of
"one paragraph."  First, the section of the EA titled "Cumulative
Impacts" consists of eleven paragraphs of text.  (See AR 434-35.)

the cumulative-impacts analysis is to provide "sufficient detail
to assist 'the decisionmaker in deciding whether, or how, to
alter the program to lessen cumulative impacts,'" Churchill
County v. Norton, 276 F.3d 1060, 1080 (9th Cir. 2001) (quoting
City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d
1142, 1160 (9th Cir. 1997)), plaintiffs do not articulate how the
EA fails to equip BLM with the requisite quantum of available
information to meet this purpose.  See Ocean Advocates v. U.S.
Army Corps of Eng'rs, 402 F.3d 846, 864 (9th Cir. 2005) (stating
that to "trigger" the requirement to prepare an EIS, a plaintiff
must "rais[e] substantial questions as to whether a project may
have a significant effect" on the environment); see also Ctr. for
Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538
F.3d 1172, 1221 (9th Cir. 2008) (en banc) (holding that the
plaintiffs "raise[d] a substantial question" as to whether
emission standards would have a significant impact by presenting
"compelling scientific evidence concerning 'positive feedback
mechanisms' in the atmosphere").  Instead, many of the cases
cited by plaintiffs involve utter failures by agencies to analyze
cumulative impacts, but plaintiffs do not identify such drastic
omissions here.  See, e.g., Muckleshoot, 177 F.3d at 811 (finding

---

Second, and more importantly, the court does not restrict its
review of the EA's site-specific cumulative-impact analysis to
that portion of the EA; the section titled "Proposed Action--
Environmental Consequences" also provides site-specific
information as to the foreseeable "incremental impact" of the
land exchange, and consistent with Klamath-Siskiyou, the court
looks to the substance of the information provided, not merely to
how it is labeled or where it is categorized.  See 387 F.3d at
997 (evaluating whether an EIS provided the requisite site-
specific cumulative-impact analysis where the EAs had failed to
do so).

that a cumulative impact statement "contain[ed] no evaluation
whatsoever of the impact on natural resources of timber
harvesting" and "focuse[d] solely on the beneficial impact the
exchange").

Undoubtedly, a cumulative-impact analysis "must be more
than perfunctory; it must provide a useful analysis of the
cumulative impacts of past, present, and future projects." Ocean
Advocates, 402 F.3d at 868 (quoting Kern v. U.S. Bureau of Land
Mgmt., 284 F.3d 1062, 1075 (9th Cir. 2002)).  Nonetheless, where
such an analysis "is fully informed and well considered," as in
this case, the court "should defer to that finding."  Id.; see
Churchill County v. Norton, 276 F.3d 1060, 1081 (9th Cir. 2001)
("We could certainly 'fly-speck' [the cumulative-impacts] chapter
. . . and find instances where the inclusion of quantitative data
would benefit the Service and the public. . . .  That is not our
role, of course. . . .  We conclude that the Fish and Wildlife
Service has taken the requisite 'hard look' at the cumulative
environmental impacts . . . and has not violated NEPA.").

2.  Impacts to Threatened and Endangered Species

Plaintiffs further contend that in preparing a FONSI
and EA instead of an EIS, BLM inadequately addressed potential
impacts to steelhead trout and chinook salmon in Salt Creek.
(Pls.' Mot. Summ. J. 11.)  Specifically, plaintiffs argue that
BLM inappropriately relied on other state and federal agencies in
assessing adverse impacts on Salt Creek and its tributaries.
(Id. at 12.)  At the same time, plaintiffs assert that BLM
improperly ignored certain concerns expressed by these agencies,
as well as publications that identified Salt Creek as a "critical

36

habitat." (Id. at 12-13.) Plaintiffs also generally criticize the EA's "lack of analysis" and BLM's failure "to do the necessary research on development-related impacts." (Id.)

BLM began its evaluation of potential impacts on Salt Creek by tiering its EA to the EIS accompanying the 1993 RMP. (AR 418.) The EIS had identified key anadromous salmonid habitat areas in the Redding area in order to determine environmental effects due to the BLM's "Land Tenure Adjustment" policy, but did not specifically identify Salt Creek as a key anadromous salmonid habitat. (AR 3591-92.) BLM proceeded to commission a Biological Assessment ("BA") of Salt Creek to further evaluate any potential effects of the proposed exchange. (Id. at 3016.) The BA was a specific assessment of the fisheries in Salt Creek and was tiered to the EA in the same way that the EA was tiered to the EIS. (Id. at 3019.)

The BA determined that habitat conditions for chinook salmon and steelhead trout were "marginal" at locations in Salt Creek upstream of Highway 299, which is where the Federal Parcel is located. (Id. at 3023.) The BA explained,

> The section upstream of [Highway 299] loses water quickly
> . . . , which is likely due to deep Goulding and Diamond
> Springs rocky sandy soils . . . and limited slope within
> this area of the watershed . . . . These existing
> natural conditions may allow for upstream migration and
> spawning of resident [steelhead trout] during rainy time
> periods, however the water levels and habitat conditions
> prevent any significant survival for downstream migration
> . . . . Spawning gravels for [chinook salmon] are
> extremely depauperate upstream of [Highway 299] and are
> minimal on the [Federal Parcel]. . . . [T]he existing
> condition of the stream above [Highway 299], particularly
> the [Federal Parcel], do[es] not provide conditions for
> successful reproduction, survival, and migration of
> salmonids.

(Id. at 3023-24.)

Despite these findings, the California Department of Fish and Game ("CDFG") expressed certain concerns regarding the disposal of the Federal Parcel.  In particular, the CDFG was "concerned that future development [of the Federal Parcel would] mobilize and deposit sediment in the spawning gravel placed at the Salt Creek and Sacramento River confluence."  (Id. at 1764; see id. at 1757 ("[CDFG] continues to be concerned with the erosive potential of the BLM property surrounding Salt Creek and the effects of the sediment load on fishery resources.").)

BLM responded to these concerns, however, by imposing a "mandatory setback" covenant on the Federal Parcel restricting development along Salt Creek tributaries.  (Id. at 411.) Specifically, the covenant prohibited development within a set distance of the tributaries, and any bridges constructed to cross the tributaries would be designed not to impede water flow. (Id.)  Any exceptions to the covenant would be granted only through written approval of the CDFG.  (Id.)  As plaintiffs concede, "[CDFG] ultimately signed off on the project after the stream setback covenants were imposed."  (Opp'n Fed. Defs.' Mot. Summ. J. 13; see AR 1758 (stating that CDFG "recommend[s] BLM include a covenant to address these issues prior to the proposed exchange so that Shasta County will have this information for implementing appropriate mitigation that would adequately protect the aquatic resources").

BLM subsequently forwarded details of the proposed land exchange, including the mandatory setback covenant, to the National Marine Fisheries Service ("NMFS"), a division of the National Oceanic and Atmospheric Administration ("NOAA").  (AR

38

3009-10.)  The NMFS observed that "any future development of the

[Federal Parcel] which might disturb Salt Creek or otherwise

cause adverse effects to listed species will require [f]ederal

permitting (through the U.S. Army Corps of Engineers), and

therefore will be subject to section 7 consultation [under the

Endangered Species Act ("ESA"), 16 U.S.C. § 1536]."  (Id. at

3010.)  In light of this requirement and the mandatory setback

covenant, the NMFS concluded that the disposal of the Federal

Parcel was "not likely to adversely affect listed salmonids."

(Id.)[6]

Regarding BLM's consultation with the CDFG and NMFS,

the record indicates that BLM did not "blindly rely" on these

agencies' assessments; rather, BLM properly supplemented its own

BA with their input.  Conservation Law Found. v. Fed. Highway

Admin., 24 F.3d 1465, 1476 (1st Cir. 1994).  NEPA encourages such

consultation across agencies of varying expertise.  See 40 C.F.R.

§ 1501.6 ("The purpose of this section is to emphasize agency

cooperation early in the NEPA process.");  see also Heartwood,

Inc. v. U.S. Forest Serv., 380 F.3d 428, 431-36 (8th Cir. 2004)

_____

[6]     In their motion for summary judgment, plaintiffs
originally asserted that a certain "Biological Opinion" of the
NMFS respecting the Bureau of Reclamation's Central Valley
Project was recently overturned in federal court.  (Pls.' Mot.
Summ. J. 13.)  Both Federal Defendants and Private Defendants
disputed the relationship of that Opinion to the instant case
(see Fed. Defs.' Cross-Mot. Summ. J. 26; Private Defs.' Mot.
Summ. J. 23 n.6), and plaintiffs did not respond to defendants'
contentions in their reply briefs or at oral argument.  Because
plaintiffs have not clarified the relevance of this evidence, and
because this evidence is outside of the administrative record,
the court will not consider it.  See, e.g., Nw. Envtl. Advocates
v. Nat'l Marine Fisheries Serv., 460 F.3d 1125, 1144 (9th Cir.
2006) ("[A]dministrative review disfavors consideration of
extra-record evidence." (citing Fl. Power & Light Co. v. Lorion,
470 U.S. 729, 743 (1985))).

39

(approving the Forest Service's reliance upon a Biological
Opinion issued by the Fish and Wildlife Service respecting a
project's potential impacts on an endangered bat species).
Further, although plaintiffs attack the "lack of analysis" in the
EA's "fisheries section" (Pls.' Mot. Summ. J. 12), plaintiffs
largely ignore the BA, which tiered to the EA and provided
extensive consideration of potential impacts on Salt Creek
tributaries that traverse the Federal Parcel (see AR 3016; see
also AR 3030-33 (listing the BA's references, which include
communications with several fisheries biologists; various maps
depicting watershed slope analysis, soil types, and erosion
probabilities; and tables and maps respecting the history of
fisheries near the Federal Parcel from 1962 to 2005).)[7]

    Despite criticizing BLM's reliance upon CDFG and NMFS's
assessments, plaintiffs proceed to rely on these agencies'
identification of Salt Creek as a "critical habitat" to claim
that the EA "uniformly play[ed] down Salt Creek's habitat value."
(Pls.' Opp'n Fed. Defs.' Cross-Mot. Summ. J. 13.)    Plaintiffs

_____

        [7]    Plaintiffs argue that the BA improperly considered data
submitted by "commenters."   (Pls.' Opp'n Fed. Defs.' Cross-Mot.
Summ. J. 13.)    These "commenters," however, primarily consisted
of fisheries biologists and other experts.   (See AR 3030-33.)
"'[A]n agency must have discretion to rely on the reasonable
opinions of its own qualified experts even if, as an original
matter, a court might find contrary views more persuasive.'"   The
Lands Council v. McNair, 537 F.3d 981, 1000 (9th Cir. 2008) (en
banc) (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360,
378 (1989)).
        Plaintiffs also contend that the BA improperly relied
on a habitat survey performed in October because steelhead trout
migrate to California's central valley rivers primarily from
November through May.   (Pls.' Opp'n Fed. Defs.' Cross-Mot. Summ.
J. 13 (citing AR 3154-56).)   The referenced "Fisheries Site
History," however, includes habitat surveys that occurred in
November 2002, January 2003, March 2004, and February 2005.   (See
AR 3154-56.)

refer to maps in the administrative record that appear to
identify one tributary on the Federal Parcel as a critical
habitat for steelhead trout.  (AR 1349.)  Nonetheless, even if a
portion of Salt Creek traversing the Federal Parcel is
appropriately considered a "critical habitat," plaintiffs do not
indicate how this designation negates CDFG and NMFS's ultimate
approval of the project.  Instead, plaintiffs cite to a "Final
Rule for Critical Habitat" promulgated by NMFS and contained in
the Federal Register that, while designating "several . . .
tributaries . . . in the vicinity of Redding . . . as critical
habitat[s]," also provides that "the conservation value" of the
streams "range[s] from low to high."  (Id. at 1353.)  This
document then simply states, "[T]hese streams may require special
management consideration to address activities such as . . .
residential and commercial development."  (Id.)[8]

---

[8]     At oral argument, plaintiffs' counsel provided the
court with a document titled "Notice of Citation to Federal
Register."  This document contains four pages from the Federal
Register that were not included in the administrative record.
These pages provide the longitude and latitude of the "upstream
endpoint" of the steelhead critical habitat in Salt Creek.  See
70 Fed. Reg. 52,604-52,605 (Sept. 2, 2005) (to be codified at 50
C.F.R. § 226).  Plaintiffs' counsel represented that she inputted
the coordinates into Google.com's map feature, which located a
point in the middle of the Federal Parcel.
        As an initial matter, the court observes that the
coordinates reported in the Federal Register must be erroneous.
Beginning with the "Yuba River Hydrologic Unit" and continuing
through the "Spring Creek Hydrologic Sub-area," longitude values
jump from approximately -120 to -1120.  See id.  As any geography
resource will attest, values of longitude--whether in decimal
format (as in this case) or degrees-minutes-seconds ("DMS")
format--range only from -180 to 180.  See, e.g., Jenny Marie
Johnson, Geographic Information 33 (2003).  By removing the
leftmost "1" from all of the measures of longitude, however, the
resulting coordinates describe locations in Redding, California.
This apparent error in the Federal Register causes the court to
question the worth of this evidence, not to mention the fact that
it falls outside of the administrative record.

41

Ultimately, BLM adequately supports its "finding of no significant impact" on threatened or endangered species and its decision not to issue an EIS. As courts often emphasize, "[t]he operative word here is 'significant'"; "some" potential adverse effects do not necessitate an EIS where an agency "use[s] its expertise, along with consultation with" other agencies, and finds that these effects are "unlikely to occur" or "would not have a significant impact on the species." Heartwood, 380 F.3d at 432. Although BLM acknowledged that development on the Federal Parcel may pose some risk to Salt Creek fisheries, the agency took steps to mitigate this risk through mandatory setback covenants and consultation with other expert agencies. See id. ("[T]he USFS did not give itself a green light to disregard the project's impact on the Indiana bat."). Accordingly, BLM's final conclusion that impacts on steelhead trout and chinook salmon would be insignificant was not arbitrary and capricious.

E.    FLPMA

The FLPMA's "public interest" provision, 43 U.S.C. §

Nonetheless, accepting plaintiffs' counsel's invitation, the court has proceeded to input the corrected coordinates of the "upstream endpoint" of the critical habitat in Salt Creek (40.5830, -122.4586) into Google.com's map feature. See 70 Fed. Reg. 52,605 (Sept. 2, 2005); see also Google Maps, http://maps.google.com (last visited Mar. 31, 2009). The resulting "upstream endpoint" of Salt Creek's critical-habitat designation is situated east of Tilton Mine Road, which in turn is situated east of the Federal Parcel. (See AR 83.) This result is consistent with BLM's BA, which found that "the existing condition of the stream above [Highway 299], particularly the [Federal Parcel], do[es] not provide conditions for successful reproduction, survival, and migration of salmonids." (Id. at 3024.) Therefore, although plaintiffs strain to provide evidence outside the administrative record that is of questionable accuracy, this evidence ultimately cuts against them.

42

1716(a), "permit[s] the Secretary of the Interior or his designee
to dispose of public lands in exchange for non-federal lands only
on condition that the public interest will be served by the
trade." Desert Citizens Against Pollution v. Bisson, 231 F.3d
1172, 1180 n.8 (9th Cir. 2000). Plaintiffs assert that BLM
failed to fully consider the public interest under the FLPMA in
the 2006 land exchange. To support their argument, plaintiffs
reference certain regulations implementing the FLPMA, which
provide:

> When considering the public interest, the authorized
> officer shall give full consideration to the opportunity
> . . . to meet the needs of State and local residents and
> their economies, and to secure important objectives,
> including but not limited to . . . enhancement of
> recreation opportunities and public access . . . .
>
> . . . .
>
> In any exchange, the authorized officer shall reserve
> such rights or retain such interests as are needed to
> protect the public interest or shall otherwise restrict
> the use of Federal lands to be exchanged, as appropriate.

43 C.F.R. § 2200.0-6(a), (i). In light of these regulations,
plaintiffs argue that "BLM failed to take a hard look at an
alternative, such as granting an easement to a [s]tate or local
agency or selling the parcel to local interests, that would have
guaranteed continued public recreation on the Federal [P]arcel."
(Pls.' Mot. Summ. J. 15.)

Plaintiffs' FLPMA argument essentially reiterates their
previous contention that BLM did not adequately consider the
"local-easement" and "local-sale" alternatives under NEPA. See
supra Subsections II.C.1-2. Again relying on Muckleshoot,
plaintiffs now contend that "failing to fully analyze" these
alternatives improperly disregarded the public interest in

43

violation of the FLPMA. (Pls.' Mot. Summ. J. 16.) The court has already determined that BLM adequately assessed these alternatives along with other factors required by the FLPMA that plaintiffs fail to mention, such as "the opportunity to achieve better management of [f]ederal lands," "protection of . . . watersheds," "consolidation of lands . . . for more logical and efficient development," and the "expansion of communities." 43 C.F.R. § 2200.0-6(b). Having done so, the court cannot inquire further. See Nat'l Coal Ass'n v. Hodel, 675 F. Supp. 1231, 1245 (D. Mont. 1987) ("At best, the Court can criticize only the form of the Secretary's analysis. . . . [T]he Court 'will not pass upon the wisdom of the agency's perception of where the public interest lies.'" (quoting Telocator Network of Am. v. F.C.C., 691 F.2d 525, 538 (D.C. Cir. 1982))), aff'd sub nom. N. Plains Res. Council v. Lujan, 874 F.2d 661 (9th Cir. 1989); see also Nat'l Coal Ass'n v. Hodel, 825 F.2d 523, 532 (D.C. Cir. 1987) ("The Secretary's public interest determination is one involving a variety of factors, the relative weights of which are left in his discretion.").

III. Conclusion

        The administrative record in this case demonstrates that BLM adequately considered a reasonable range of alternatives before approving the 2006 land exchange. BLM's determination that disposal of the Federal Parcel would not have a significant effect on the environment also evinced the requisite "hard look" that NEPA requires, including due consideration of cumulative impacts as well as potential impacts on threatened and endangered species. Finally, although the court cannot appraise the merits

44

of BLM's conclusions, the record establishes that BLM weighed appropriate factors under the FLPMA in order to protect the public interest. Accordingly, the court must deny plaintiffs' motion for summary judgment and grant defendants' cross-motions for summary judgment.

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment be, and the same hereby is, DENIED; and defendants' cross-motions for summary judgment be, and the same hereby are, GRANTED.

DATED:  April 7, 2009

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE